IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DELORES NICHOLS, | ) | CASE NO. 1:13-CV-2830 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule 72.2(b).  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Delores Nichols' ("Plaintiff" or "Nichols") application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be REVERSED and REMANDED.

## I.  PROCEDURAL HISTORY

In June 2008, Plaintiff filed a prior application for Supplemental Security Income benefits.  On July 30, 2010, administrative law judge ("ALJ") Michael Cummings found her not disabled from June 4, 2008, her application date, through July 30, 2010, the date of his decision.  (Tr. 67-75).  Although the ALJ found Nichols had the severe impairments of degenerative disc disease, obesity, and hypothyroidism, he concluded that Nichols could still perform sedentary work that existed in significant numbers in the national economy. (*Id.*).

1

On February 1, 2011, Nichols filed the application for Supplemental Security Income benefits currently at issue before the Court. (Tr. 93, 107, 159).  Plaintiff alleged she became disabled on July 31, 2010, due to suffering from lower back pain extending into her hip and left leg, as well as, emotional issues. (Tr. 159, 162).  The Social Security Administration denied Plaintiff's application on initial review and upon reconsideration. (Tr. 73-76, 85-91).

At Plaintiff's request, ALJ Edmund Round convened an administrative hearing on June 22, 2012, to evaluate her application. (Tr. 27-62).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id.*).  A vocational expert ("VE"), Carol Moseley, also appeared and testified. (*Id.*).

On July 25, 2012, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 14-21). The ALJ recounted that under *Drummond v. Commissioner of Social Security*, 126 F.3d 837, (6th Cir. 1997), the Sixth Circuit held that if a final decision by the Administration on a prior disability claim contains a finding of a claimant's residual functional capacity ("RFC"), the Administration may not make a different finding in adjudicating a subsequent disability claim with an adjudicated period arising under the same Title of the Act, unless new and additional evidence or changed circumstances provide a basis for a different finding. (Tr. 14).  The ALJ determined that there was no new or material evidence that would lead to a different conclusion from the July 2010 finding on Plaintiff's previous application for benefits. (Tr. 14-15).  After applying the five-step sequential analysis,[1] the ALJ determined

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

> (1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).

Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 9-10).  The Appeals Council denied the request for review, making the ALJ's August 9, 2012 determination the final decision of the Commissioner. (Tr. 1-4).  Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. § 1383(c)(3).

## II. EVIDENCE

### A.  Personal and Vocational Evidence

Nichols was born on April 20, 1976, and was 35-years-old on the date the ALJ rendered his decision. (Tr. 159).  Accordingly, Plaintiff was considered to be a "younger person" for Social Security purposes.  *See* 20 C.F.R. 416.963(c).  Plaintiff has no past relevant work. (Tr. 56-57, 168-69).

---

(2)   If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)   If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)   If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)   Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

**B. Medical Evidence[2]**

On December 15, 2009, Plaintiff treated with primary care physician Ravi Chimalakonda, M.D., and reported that she was doing well. (Tr. 325).  She described low back pain at a level "4" out of "10," which extended to her left leg. (*Id.*).  Dr. Chimalakonda referred Plaintiff to neurology for evaluation and adjusted Plaintiff's medications.  (*Id.*).

On January 21, 2010, Plaintiff consulted with neurologist Preetha Muthusamy, M.D. (Tr. 319-21).  Plaintiff exhibited "5 out of 5" strength in the upper and lower extremities. (Tr. 320).  Dr. Muthusamy noted significant tenderness and spasms involving the left paraspinal muscles. (*Id.*).  Nichols also exhibited an antalgic gait, but had a normal pinprick sensation in all four extremities and normal deep tendon reflexes. (*Id.*).  Dr. Muthusamy opined that Plaintiff suffered from a history of scoliosis and a moderate amount of spondylosis in the lumbosacral spine, which could be contributing to her pain in the left lower extremity. (*Id.*).  The doctor observed that Plaintiff failed physical therapy and epidural injections in the past. (*Id.*).  Although she was taking the maximum does of Neurotin, Plaintiff alleged that it provided no relief. (*Id.*).  Dr. Muthusamy recommended a trial of Nortiptyline. (*Id.*).

Plaintiff returned to Dr. Muthusamy on February 18, 2010. (Tr. 315-16).  Dr. Muthusamy recommended an MRI of the lumbosacral spine, and encouraged Plaintiff to try the dose of Nortiptyline that was prescribed at her last visit. (Tr. 316). Dr. Muthusamy advised Nichols to follow-up with him in two months, but it does not appear as though she did. (*Id.*).

On February 22, 2010, Plaintiff underwent an MRI of the lumbar spine, which Parvez Masood, M.D., interpreted. (Tr. 327-28). At L4-5 the doctor identified paracentral disk protrusion, where the disk touched the anterior aspect of the traversing left L5 nerve root

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

"without impingement o[r] compression." (Tr. 327).  At L5-S1 there was a diffuse disk bulge with disk protrusion. (*Id.*).

On March 24, 2010, Abdul Itani, M.D., evaluated Plaintiff's low back and left leg pain. (Tr. 263).  Nichols reported that all positions were severely uncomfortable and that she could not walk. (*Id.*).  A physical examination showed Plaintiff's low back to be tender to percussion and a limited range of motion. (*Id.*).  There were no gross motor deficits or atrophy. (*Id.*).  There was weakness in the left dorsiflexors, but the remaining muscle groups were within normal limits. (*Id.*).  Plaintiff exhibited positive straight leg raises at 30 degrees on the left and 60 degrees on the right. (*Id.*).  Her sensory examination was normal.  Dr. Itani recounted that an MRI of the lumbar spine showed degeneration at L4-L5 and L5-S1, along with disc herniation and arthropathy at L4-L5 and L5-S1. (*Id.*).  Because of the chronic nature of her problems, as well as the failure of prior physical therapy and pain management, Dr. Itani recommended fusion surgery. (*Id.*).

On May 11, 2010, Plaintiff presented to Dr. Chimalakonda and indicated that she did not want to undergo fusion surgery. (Tr. 294).  She stated that she had stopped seeing Dr. Itani and had lost her insurance. (*Id.*).  Nichols complained of back pain ranging from a "5 to 6" out of "10," radiating into both legs and feet. (*Id.*).  She denied weakness in her legs, and tingling or numbness in her feet. (*Id.*).  Dr. Chimalakonda refilled Plaintiff's prescriptions of Mobic, Neurotin, and Vicodin. (*Id.*).  The doctor discussed follow up with Dr. Itani for surgery. (*Id.*).

During September 2010, Nichols complained to Dr. Chimalakonda of low back pain at a level "3 or 4" out of "10," radiating into her left hip.  (Tr. 291).  The pain was no longer radiating into her left foot. (*Id.*).  Plaintiff refused surgery and pain management. (*Id.*).  In November

2010, Dr. Chimalakonda again referred Plaintiff to pain management. (Tr. 288).  He continued her prescription of Gabapentin and prescribed Vicodin as needed. (*Id.*).

On January 6, 2011, Plaintiff experienced exacerbated back pain, radiating from her mid-back to her low back and down through her left foot, after having fallen. (Tr. 283).  She described the severity of her pain at a level "9" out of "10." (*Id.*).  Dr. Chimalakonda noted that Plaintiff underwent an MRI, which showed left paracentral disk protrusion at L4-L5. (*Id.*).  Although the disk touched the anterior aspect of the transverse left L5 nerve root, there was no impingement or compression. (*Id.*).  The doctor again recounted that Plaintiff refused surgery and a pain management evaluation, though she had gone through physical therapy in the past. (*Id.*).  Upon physical examination, Plaintiff had tenderness over the low back and buttocks. (*Id.*).  A straight leg raise test was positive on the left with minimal elevation. (*Id.*).  Dr. Chimalakonda described Nichols' gait as "very halting" with a pronounced limp. (*Id.*).  Dr. Chimalakonda started Plaintiff on Medrol Dosepak and Percocet, continued Mobic, and increased her dosage of Flexeril. (*Id.*).  He also referred Plaintiff to physical therapy and pain management. (*Id.*).

On February 2, 2011, Plaintiff filed her application for benefits.  By February 28, 2011, Plaintiff reported to Dr. Chimalakonda that her back pain was fairly well controlled at a level "2" out of "10." (Tr. 477).

On February 28, 2011, pain management specialist Apran Desai, D.O., also evaluated Plaintiff. (Tr. 371-72).  Plaintiff's deep tendon reflexes were intact bilaterally; her sensation and strength were decreased in the left lower extremity; and she exhibited an antalgic gait. (Tr. 372).  Plaintiff had spams and tenderness in the paravertebral muscles. (*Id.*).  She reported pain with flexion, extension, and lateral flexion bilaterally. (*Id.*).  Her straight leg raise test was positive on

6

the left. (*Id.*).  Dr. Desai prescribed physical therapy and an epidural steroid injection, with the possibility of surgery if conservative treatment failed. (*Id.*).

In March 2011, Nichols underwent a physical therapy evaluation. (Tr. 378-81).  Plaintiff jumped in pain with light touch to her lumbar spine, and the physical therapist questioned whether Plaintiff was hypersensitive. (Tr. 379).  The physical therapist was unable to fully evaluate Nichols due to indications of pain, neural tension, and guarding with all movement. (Tr. 379-81).  Plaintiff's recommended treatment plan included physical therapy sessions two to three times weekly, for a total of four weeks. (Tr. 381).  Nichols attended approximately four sessions, but cancelled or did not attend her other scheduled sessions. (Tr. 384-96).

During March, April, and May 2011, Plaintiff underwent epidural injections. (Tr. 370, 374, 398-403).  Nichols treated with Dr. Chimalakonda on May 10, 2011, and stated that her back pain was much improved due to the injections. (Tr. 467).  She was able to tolerate her pain and was doing well overall. (*Id.*).  Dr. Chimalakonda wrote that Plaintiff appeared much more comfortable, and although she had difficulty bending, pulling, pushing, and reaching, he did not feel that she was unemployable. (*Id.*).[3]

On April 10, 2011, state agency reviewing physician Linda Hall, M.D., conducted a review of the record. (Tr. 86-91).  Dr. Hall concluded that Plaintiff's impairments did not meet or medically equal Listing 1.04. (Tr. 86).  She opined that Nichols could lift and carry up to 10 pounds occasionally and frequently; stand or walk for a total of 4 hours in an 8 hour day; sit for a total of 6 hours in an 8 hour day. (Tr. 87).  Dr. Hall indicated that she imposed such limitations due to radiculopathy and pain. (*Id.*).  She also noted that an MRI from February 2010 showed left disc protrusion at L4-5, which touched the left L5 nerve root without impingement or

---

[3] As the Commissioner notes, the ALJ incorrectly stated that Dr. Chimalakonda believed "the claimant is unemployable." (Tr. 19).

compression, and that Plaintiff had an antalgic gait with a pronounced limp. (*Id.*). Dr. Hall opined that Plaintiff could frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, or crouch; and frequently kneel or crawl. (Tr. 88). Dr. Hall found that Nichols had no manipulative limitations, but should avoid all exposure to occupational hazards. (Tr. 88-89).

On June 24, 2011, Plaintiff told Dr. Chimalakonda she was feeling well, aside from back pain and fatigue. (Tr. 461). Dr. Chimalakonda explained that Plaintiff "apparently [was] not responding to pain injection[s], hence, she has been referred to surgery." (*Id.*).

During July 2011, orthopedic spine specialist Susan Stephens, M.D., wrote a letter to Dr. Desai in which she recounted her first consultation with Plaintiff. (Tr. 364-65). Plaintiff had informed Dr. Stephens that her pain ranged from a "level 5 to 10." (Tr. 365). Upon physical examination, Plaintiff had superficial and deep tenderness on palpation to the lumbar spine. (*Id.*). Dr. Stephens found a decreased range of motion of less than 30 degrees in the spine, a positive straight leg raise on the left, normal motor strength, normal deep tendon reflexes throughout, and a full, painless range of motion in both hips. (*Id.*). Dr. Stephens also reviewed Plaintiff's MRI from February 2010. (*Id.*). She opined that the MRI revealed "L4-5 subluxation as well as central disc, causing nerve root impingement as well as stenosis." (*Id.*). Dr. Stephens explained that she ordered a repeat MRI and would make further recommendations thereafter. (Tr. 364).

An MRI of Nichols' lumbar spine was taken on August 8, 2011. (Tr. 397). Kristine Blackham, M.D., interpreted the image. (*Id.*). At L5-S1 there was a disc herniation that contacted the right S1 nerve root, and at L4-5 there was loss of disc space height and a disc herniation that contacted the left L5 nerve root. (*Id.*). Otherwise, there was no central canal or neural foraminal stenosis. (*Id.*).

On August 18, 2011, Plaintiff returned to Dr. Stephens. (Tr. 410).  The doctor opined that the updated MRI showed L4-5 subluxation, decreased disc height, edema of the end plates, and disc herniation causing foraminal stenosis. (*Id.*).  At L5-S1 the imaging showed large disc herniation with stenosis. (*Id.*).  Dr. Stephens opined that surgery involving a fusion and discectomy was necessary. (*Id.*).

On August 26, 2011, state agency reviewing physician William Bolz, M.D., conducted an independent review of the updated record. (Tr. 100-03).  Dr. Bolz opined that Plaintiff's impairments did not meet or medically equal Listing 1.04. (Tr. 100).  He found that Nichols could lift or carry up to 10 pounds occasionally and frequently; stand for a total of 4 hours and sit for a total of 6 hours in an 8 hour workday; frequently climb ramps or stairs, kneel, and crawl; never climb ladders, ropes, or scaffolds; occasionally stoop or crouch; and must avoid all exposure to hazards. (Tr. 101-03).

In September 2011, Nichols complained to Dr. Chimalakonda of intermittent back pain. (Tr. 455).  The doctor mentioned that in the past, a spine surgeon felt breast reduction surgery would help alleviate pain. (*Id.*). Dr. Chimalakonda referred Plaintiff to a plastic surgeon. (*Id.*).

On February 6, 2012, Plaintiff began treating with Raimantas Drublionis, M.D.  (Tr. 414-15).  Plaintiff described sinus congestion, fever, chills, severe low back pain, fatigue, and weakness. (Tr. 415).  Upon physical examination, Plaintiff had low back tenderness. (*Id.*).  Dr. Drublionis prescribed medication for cold-like symptoms and low back pain. (*Id.*).

On March 18, 2012, Plaintiff presented to the emergency department due to chronic back pain. (Tr. 426-27).  A physical examination showed pain with range of motion, but she was able to move all extremities and had a normal gait. (Tr. 426).  Plaintiff was discharged with a prescription for medication. (Tr. 427).

From March to May 2012, Plaintiff treated with chiropractor James Kist, D.C. (Tr. 484-92, 495).  Throughout treatment, Plaintiff's self-reports of back pain ranged from moderate to severe pain. (Tr. 488-92).

During April and May 2012, Dr. Drublionis found Plaintiff had mild to severe low back tenderness, but normal joints and reflexes. (Tr. 502-04).  He prescribed medication. (*Id.*).  On May 8, 2012, Dr. Drublionis completed a medical source statement speaking to Plaintiff's physical limitations. (Tr. 506-08).  He recommended the following:

- Plaintiff could stand or walk continuously for 15 minutes before needing to lie down and recline for 30 minutes. She could stand for a total of 1 to 2 hours during an 8 hour workday.
- Plaintiff could sit continuously for 15 minutes before needing to lie down or walk for 15 minutes.  She could sit for a total of 1 to 2 hours during an 8 hour workday.
- Plaintiff must rest by lying down or reclining in an easy chair for a total of 5 hours during an 8 hour workday. [4]
- Plaintiff could lift up to 1 to 5 pounds occasionally, and rarely or never lift weight exceeding 5 pounds.
- Nichols could occasionally balance and never stoop.
- Plaintiff would miss work more than 3 times per month due to her impairments or treatment.

(Tr. 506-08).  The doctor based the above-described limitations on diagnoses of lumbar degenerative disc disease, sciatica, herniated discs, obesity, and osteoarthritis. (*Id.*).

On May 11, 2012, Mr. Kist filled out a statement regarding Plaintiff's physical limitations. (Tr. 479-81).  He opined that Plaintiff could perform less than sedentary work, and that her ability to see, hear, and speak were also affected by her impairments. (*Id.*).

In June 2012, Plaintiff presented to Dr. Drublionis with right foot pain and intermittent leg swelling, from being scratched by an animal. (Tr. 501).  A physical examination showed

---

[4] In a recap of "total sitting, standing/walking, and resting," Dr. Drublionis imposed somewhat different limitations than he did earlier in his opinion.  He opined that over the course of an 8 hour day, Plaintiff could stand/walk for 2 to 3 hours, sit for 2 to 3 hours, and rest for 2 to 3 hours. (Tr. 507).

severe low back tenderness, but normal extremities with no edema, good pulsations with no calf tenderness, and intact reflexes in the upper and lower extremities. (*Id.*).   Dr. Drublionis continued Plaintiff on medication for her back pain. (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant has not engaged in substantial gainful activity since February 1, 2011, the application date.

2.  The claimant has the following severe impairments: lumbar degenerative disc disease, obesity, and hypothyroidism.

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  The claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. 416/967(a).   She can lift, carry, push and/or pull a maximum of 10 pounds, can sit for 6 hours, and can stand and/or walk for 2 hours of an 8-hour workday.

5.  The claimant has no past relevant work.

6.  The claimant was born on April 20, 1976 and was 34 years old, which is defined as a younger individual age 18-44, on the date the application was filed.

7.  The claimant has at least a high school education and is able to communicate in English.

. . .

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 1, 2011, through the date of this decision.

(Tr. 14-20) (internal citations omitted).

11

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x. 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  However, it

12

may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A.  Whether the ALJ erred in his analysis of Listing 1.04

Plaintiff argues that the evidence shows she meets or medically equals Listing 1.04, the listing for disorders of the spine.  Additionally, Plaintiff alleges that the ALJ failed to sufficiently articulate why her impairments do not meet or equal the listing.

At the third step of the disability evaluation process, the ALJ must evaluate whether the claimant's impairments satisfy the requirements of any of the medical conditions enumerated in the Listing of Impairments within 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R §§ 416.920(a)(4)(iii), 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments recites a number of ailments which the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 416.925(a), 404.1520(a).  Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 416.925(c)(3), 404.1520(c)(3).

In order to "meet" a listing, the claimant must satisfy all of the listing's requirements. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009).  However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled at this stage if his impairments "medically equal" the listing.  20 C.F.R. §§ 416.926(b)(3), 404.1526(b).  To do so, the claimant must present "medical findings" that show his impairment is "equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531,

110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original).  It is not sufficient for a plaintiff to demonstrate that the overall functional impact of his impairments is as severe as that of a listed impairment. *Id.*

Plaintiff contends that she satisfied the requirements of section A of Listing 1.04, which states:

> Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord.  With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Sbpt P, App. 1, § 1.04.

Here, the ALJ concluded at step two of his analysis that Plaintiff's lumbar degenerative disc disease, obesity, and hypothyroidism were severe impairments. (Tr. 17).  At step three, he found that despite Plaintiff's severe impairments, there were "no objective findings of the necessary severity to meet or medically equal Listing 1.04." (*Id.*).  The ALJ acknowledged that Nichols suffered from lumbar disc herniations, but concluded that the evidence did not show "nerve root compression characterized by motor and/or reflex loss" as required by Listing 1.04A. (Tr. 17).  Beyond this observation, the ALJ provided no discussion of the additional requirements delineated in section A. (*Id.*).

Plaintiff maintains that evidence in the record establishes nerve root compression. Nichols cites Dr. Stephens' July 2011 opinion in which the doctor opined that a February 2010 MRI of the lumbar spine showed "nerve root impingement" at L4-5. (Tr. 365).

14

Defendant argues that the evidence does not demonstrate nerve root compression.  In support of this argument, the Commissioner points to Dr. Masood's interpretation of the same MRI from February 2010.  Dr. Masood opined that the MRI did not reveal impingement or compression of the nerve root. (Tr. 327-28).  Additionally, Defendant argues an updated July 2011 MRI of the lumbar spine confirmed a lack of nerve root impingement. (Tr. 397).

In response, Plaintiff asserts that the opinion of Dr. Stephens, a board certified orthopedic surgeon, should be entitled to greater deference than that of Dr. Masood, who is a radiologist.  Nichols seems to concede that with regard to the updated July 2011 MRI, no physician stated that nerve root impingement was shown.  Nonetheless, she contends that a nerve root must have been compromised in the 2011 MRI, because Dr. Stephens found a discectomy necessary after reviewing the image. (Tr. 410).

Additionally, Plaintiff argues that the ALJ's failure to provide a discussion of evidence in the record relevant to Listing 1.04 renders the step three finding to be without support of substantial evidence.  Plaintiff relies on the Sixth Circuit's decision in *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011) to support her argument.

In *Reyonlds*, the Sixth Circuit set forth the requirements for an ALJ's step three analysis as follows:

> In short, the ALJ need[s] to actually evaluate the evidence, compare it to [the criteria] of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without [such articulation], it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416.  Decisions in this district applying *Reynolds* have indicated that a "rote recitation of boilerplate language by an ALJ" is insufficient to carry the listing analysis. *Grohoske v. Comm'r of Soc. Sec.*, No. 3:11-CV-410, 2012 WL 2931400, at *3 (N.D. Ohio July 18, 2012) (*quoting Jones v. Comm'r of Soc. Sec.*, No. 5:10-CV-2621, 2012 WL 946997, at *8 (N.D. Ohio Mar. 20,

15

2012)) (A "perfunctory recitation of the analytic formula, without any development, as required by *Reynolds*, of how particular items of record evidence do or do not match specific criteria of the listing, leaves the reviewing court without a basis for meaningful review, and ultimately precludes a finding that this decision was supported by substantial evidence."); *Davis v. Comm'r of Soc. Sec.*, No. 5:12-CV-2577, 2013 WL 3884188 (N.D. Ohio July 26, 2013); *Shea v. Astrue*, No. 1:11-CV-1076, 2012 WL 967088 (N.D. Ohio Feb. 13, 2012) *report and recommendation adopted sub nom. Shea v. Comm'r of Soc. Sec.*, No. 1:11-CV-1076, 2012 WL 967072 (N.D. Ohio Mar. 21, 2012).   A heightened articulation standard is not required at step three of the sequential evaluation. *Marok v. Astrue*, No. 5:08-CV-1832, 2010 WL 2294056, at *3 (N.D. Ohio June 3, 2010) (*citing Bledsoe v. Barnhart*, No. 04–4531, 2006 WL 229795, at *411 (6th Cir. Jan. 31, 2006) (*citing Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986)).   Even so, the ALJ must make sufficiently clear the reasons for his listing determination so that the court can conduct a meaningful review. *Id.*

Problematically, the ALJ's listing analysis does not confront Dr. Stephens' interpretation of the 2010 MRI in which she opined that the nerve root was impinged.  The 2010 MRI was performed prior to the date on which Plaintiff filed her application for benefits that is currently before the Court. (Tr. 327-28).  However, Dr. Stephens issued her opinion regarding the MRI during the relevant period. (Tr. 365).  Dr. Stephens is also a specialist with regard to the impairment at issue, and after an updated MRI was obtained, the doctor persisted in identifying defects requiring greater than conservative treatment, including the need for surgical intervention. (Tr. 410).  Additionally, the ALJ did not confront Dr. Stephens' opinion in the latter stages of the sequential evaluation.

For a number of reasons, the Court concludes that the ALJ's analysis of Listing 1.04A failed to adequately address whether Plaintiff satisfied the listing.  Due to the ALJ's failure to discuss Dr. Stephens' observations, the Court cannot ascertain whether the ALJ implicitly rejected Dr. Stephens' opinion based on other evidence in the record that was contradictory, or whether the ALJ simply did not review the opinion.  This is particularly concerning given that during the administrative hearing, Plaintiff's counsel specifically referenced Dr. Stephens' opinion in relation to the listing. (Tr. 33-34).  In addition, Plaintiff's brief points to evidence beyond Dr. Stephens' opinion that raises a question as to whether she meets or medically equals the listing.  Furthermore, at step three the ALJ engaged in no discussion of evidence illustrating why Plaintiff did not meet or medically equal the other requirements of section A.

The Commissioner points to evidence in the record that would arguably show Plaintiff did not meet the requirements of the listing.  Yet, the ALJ did not include such an analysis in his step three finding. "[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action.  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, at *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation omitted)).  *See also Hunter v. Astrue*, No. 1:09-CV-2790, 2011 WL 6440762, at *4 (N.D. Ohio Dec. 20, 2011) (remanding where the ALJ failed to provide a meaningful review of the record evidence in relation to the listing and rejecting Defendant's post-hock rationalizations).

Nor does the ALJ's opinion at step four of the sequential analysis provide sufficient discussion of the evidence so as to allow the Court to conclude that Nichols' impairments did not meet the listing. *See Grohoske*, 2012 WL 2931400, at *3 n.53 (remanding, noting that "the ALJ's

discussions at step four were not so extensive as to provide sufficient evidence of [the plaintiff's] impairments in light of the listing as to permit a court to conclude from other parts of the ALJ's opinion that the listings were not met."). In particular at step four, the ALJ failed to discuss any evidence from Dr. Stephens, which concerns the undersigned because of her status as a specialist and her finding that Plaintiff's condition required surgical intervention.

For the reasons stated, Plaintiff is entitled to remand in this case. On remand, the ALJ should discuss the evidence relevant to Listing 1.04 and consider whether, in light of that evidence, Plaintiff's impairments satisfy the listing.

**B.  Whether the ALJ's treating source analysis was flawed**

Plaintiff maintains that the ALJ violated the treating physician doctrine when evaluating Dr. Drublionis' opinion. Nichols also asserts that Dr. Drublionis' opinion constitutes substantial evidence showing that her condition worsened since her prior disability determination to overcome the dictates of res judicata as set forth in *Drummond v. Commissioner of Social Security*, 126 F.3d 837, (6th Cir. 1997) and *Dennard v. Secretary of Health and Human Services*, 907 F.2d 598 (6th Cir. 1990). Had the ALJ appropriately accepted the opinion, she maintains, the ALJ would not have been bound by the prior disability decision.

Dr. Drublionis began treating Plaintiff in February 2012, and served as her primary care provider. (Tr. 415). The doctor treated Plaintiff on approximately five occasions before issuing a medical source statement speaking to Plaintiff's physical limitations on May 8, 2012. (Tr. 414-15, 502-04, 506-08). The parties do not contest Dr. Drublionis' status as a "treating physician."

It is well-established that an ALJ must give special attention to the findings of the claimant's treating sources. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule" is a reflection of the Social Security

18

Administration's awareness that physicians who have a long-standing treating relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2). The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson*, 378 F.3d at 544.

When a treating source's opinion is not entitled to controlling weight, the ALJ must determine how much weight to assign to the opinion by applying factors set forth in the governing regulations. 20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6). These factors include the examining relationship, the treatment relationship, the length of treatment and frequency of examination, supportability and consistency of the opinion, the source's specialization, and any other factors tending to support or contradict the opinion. *Id.* The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinions that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinions and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (*quoting* S.S.R. 96-2p, 1996 WL 374188, at *5).

To support her argument that the ALJ violated the treating physician rule, Plaintiff points to *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-77 (6th Cir. 2013). In *Gayheart* the Sixth Circuit emphasized that the regulations require two distinct analysis, with separate standards, when assessing the opinion of a treating source. *Id.* First, the ALJ must consider if the treating source's opinion should be awarded controlling weight, if it is well-supported by clinical and laboratory diagnostic techniques and not inconsistent with other

substantial evidence in the record. *Id.* Only when the ALJ does not give the opinion controlling weight, does the analysis move on to what weight the opinion should receive based on the regulatory factors. *Id.*

The ALJ in *Gayheart* failed to make a finding as to step one—controlling weight—and did not apply the standards as set out in the regulations. *Id.* at 376. Instead, the ALJ assigned the opinion of the treating source little weight, justifying the finding based on the factors set out in the regulations, including frequency of treatment and inconsistencies between the opinion and treatment records. *Id.* The Court explained that factors, such as the frequency of treatment, were only properly applied after an ALJ has determined that a treating source opinion will not be afforded controlling weight. *Id.* at 376-77.

This Court has explained that *Gayheart* is not a new interpretation of the treating source doctrine, but instead reinforces the Sixth Circuit's prior holdings. *Aiello-Zak v. Comm'r of Soc. Sec.*, No. 5:13-CV-987, 2014 WL 4660397, at *4 (N.D. Ohio Sept. 17, 2014) (*citing Rogers v. Comm'r*, 486 F.3d 234 (6th Cir. 2007); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)). If "the ALJ adequately addresses the factors required by *Gayheart* and articulates good reasons for discounting the opinion of a treating source, the Commissioner's decision will not be upset by a failure to strictly follow the *Gayheart* template." *Id.* at *5 (*citing Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 427-28 (6th Cir. 2014)). The ALJ must give good reasons for the weight given and consider the factors for weighing opinion of medical sources. *Id.* When considering the factors and providing good reasons, the ALJ is not required to perform a factor-by-factor analysis. *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011). Nevertheless, "the reasons [provided] must be supported by the evidence in the record and sufficiently specific to make clear the weight given

to the opinion and the reasons for that weight." *Brasseur v. Comm'r of Soc. Sec.*, 525 F. App'x 349, 351 (6th Cir. 2013) (*citing Gayheart*, 710 F.3d at 376).

In regard to Dr. Drublionis, the ALJ summarized the limitations assigned by the physician and indicated that he afforded them "little weight." (Tr. 19). The ALJ explained that he devalued the opinion because the doctor's "limitations on sitting, standing, walking, balancing, stooping, crouch[ing], and climbing ladders, ropes, or scaffolds are inconsistent with the objective findings, including intact motor strength, normal deep tendon reflexes, a lack of muscle atrophy, intact sensation, and a normal gait." (*Id.*).

The ALJ's handling of the treating source opinion was not in strict compliance with *Gayheart*. While the ALJ afforded less than controlling weight to Dr. Drublionis' opinion, he failed to articulate his controlling weight analysis—that is, the ALJ did not explain whether he awarded less than controlling weight to the opinion because it was not well-supported by clinical and laboratory techniques or because it was inconsistent with other substantial evidence in the record. Instead, the ALJ skipped this step of the analysis and went on to provide a reason for the "little weight" that was awarded to the opinion.

Despite this error, remand may not be necessary if the ALJ gave sufficient good reason for his assignment of weight in accordance with the regulatory factors. Upon review, the reason the ALJ articulated for discounting the treating physician is, in part, factually incorrect. The ALJ indicated that Dr. Drublionis recommended limitations on a variety of activities, including crouching and climbing, which were inconsistent with other objective findings. (Tr. 19). Yet, Dr. Drublionis' medical source statement did not address Plaintiff's ability to perform crouching or climbing. (Tr. 506-08). In this respect, the ALJ's opinion does not support his treating source

analysis, and causes the Court to question how closely the ALJ examined the opinion when making the disability determination.

The ALJ correctly observed that the treating source statement contained Dr. Drublionis' opinion as to Plaintiff's abilities to sit, stand, walk, balance, and stoop.  According to the ALJ, these limitations were inconsistent with objective findings, including intact motor strength, normal deep tendon reflexes, a lack of muscle atrophy, intact sensation, and a normal gait. (Tr. 19).  These objective findings tend to demonstrate that Plaintiff was functioning well, despite her alleged back pain and sciatica.  Nevertheless, the ALJ did little to articulate how this evidence undermines the specific limitations Dr. Drublionis imposed.  Additionally, the record contains evidence of severe low back tenderness, positive straight leg raise examinations, decreased strength, and at times, an antalgic gait, which Plaintiff argues support Dr. Drublionis' limitations.  Earlier in his opinion, the ALJ acknowledged that such contradictory evidence existed, but did little to reconcile this conflicting evidence. (Tr. 18).  Accordingly, the undersigned does not find the ALJ's reasoning particularly persuasive.

The Commissioner emphasizes that, in addition to the express reason the ALJ provided for discounting Dr. Drublionis, mild to moderate objective MRI findings also contradicted the doctor's limitations.  However, the Commissioner points to no medical source characterizing the MRI results as "mild to moderate."  Upon reviewing the 2011 MRI, Dr. Stephens prescribed surgery. (Tr. 410).  As a result, the evidence does little to support the ALJ's analysis.

The Commissioner also emphasizes that Plaintiff's course of conservative treatment contradicts the treating source opinion.  The ALJ did not specifically point to conservative treatment in support of his treating source determination.  Earlier in the step four analysis, the ALJ explained that the type of treatment Plaintiff underwent for her back impairment failed to

22

support a finding of disability. (Tr. 18).  The ALJ also noted that Plaintiff's refusal of surgical intervention and failure to attend appointments undermined her claims. (*Id.*).

Because they are not part of the ALJ's treating source analysis, these arguments edge on being *post hoc* rationalizations that the Court cannot consider.  However, even when these rationales are accounted for, it remains a close call as to whether they are sufficient to uphold the treating source analysis.  It is true that Plaintiff's treatment was limited to measures such as pain management, injections, and physical therapy, but on multiple occasions, Nichols' physicians recommended surgical intervention, despite her aversion to surgery and her failure to attend all appointments.

Given the flaws that exist in the ALJ's treating source analysis, and because remand is otherwise necessary for the ALJ to remedy errors at step three, the ALJ should reassess the opinion of Dr. Drublionis.  This recommendation is further supported by the impact that the ALJ's treatment of Dr. Drublionis' opinion has on res judicata.  Upon remand, the ALJ ought to articulate a clear treating source analysis in accordance with the procedural requirements of the doctrine.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.   Accordingly, the undersigned recommends that the decision of the Commissioner be REVERSED and REMANDED.


        s/ Kenneth S. McHargh
        Kenneth S. McHargh
        United States Magistrate Judge


Date:  November 24, 2014.




ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).   Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).